# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-1310

YORLI P. HUFF,

*Plaintiff-Appellant*,

*v.*

MICHAEL F. SHEAHAN,
in his official capacity as Sheriff
of Cook County,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 4568—**Joan B. Gottschall**, *Judge.*

_____

ARGUED DECEMBER 1, 2006—DECIDED JULY 16, 2007

_____

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
MANION, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Yorli Huff brought this action for
damages for race and sex discrimination that she claimed
to have suffered during her employment with the Sheriff's
Department of Cook County, Illinois. She named various
defendants in their individual and personal capacities. A
jury trial resulted in a verdict in favor of all the defendants
on all claims. The district court later denied a Rule 59(e)
motion for a new trial and a renewed motion for judg-

ment as a matter of law. Ms. Huff timely appealed the denial of this motion and the underlying judgment against her. She seeks review only of her Title VII claim against her former employer, Cook County Sheriff Michael Sheahan ("the Sheriff"). For the reasons stated in this opinion, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

Ms. Huff was employed by the Cook County Sheriff's Department and was assigned to the Metropolitan Enforcement Group ("MEG"), a separate, multi-jurisdictional narcotics task force staffed by personnel of multiple law enforcement agencies including the Sheriff's Department. Ms. Huff began working in MEG in 1992 and remained there until 1997. For a period of several years, while detailed to MEG, Ms. Huff worked under the supervision of Andrew Douvris and Fred Guerra, who were also Sheriff's Department personnel.

Ms. Huff alleged a variety of serious claims of discrimination on the part of her supervisors at MEG: using, on a regular basis, racial and gender epithets in reference to her and to other African-Americans;[1] providing her

---

[1] Some of the testimony at trial suggested that Mr. Guerra and Mr. Douvris used the terms "nigger" and "bitch" to refer to Ms. Huff in the workplace, along with English and Spanish variants and combinations. Mr. Douvris apparently said that "more black

(continued...)

with inferior equipment and assignments; frustrating her request for a transfer to another department; harassing her by paging her and checking on her location at all times; denying her requests to use flex-time benefits available to others; isolating her from other African-Americans in the office with explicit instructions that she not socialize with them;[2] and marginalizing her to such a degree that she eventually lost her position in the Sheriff's Department. Ms. Huff claims that, during this time, she documented some of the incidents, spoke to Mr. Guerra and Mr. Douvris about the harassment and reported the discrimination to her MEG supervisor, all to no avail. She, and several other employees assigned to MEG, stated that the Sheriff's Department never informed them about proper procedures for reporting harassment; she also testified that, when she did learn of the procedures, she availed herself of these options and made a complaint to the Sheriff's equal employment opportunity officer. She stated that, after her reports of the conduct, she was further harassed by MEG staff members, including fellow employees.

---

[1] (...continued)
men should beat black women," R.388-14 at 2647; *see also* R.388-9 at 1579-80, and "black women need to be kept in their place," R.388-10 at 1939; *see also* R.388-7 at 1243. Mr. Douvris also apparently spoke in stereotypical racial slang on some occasions when recounting things said to him by Ms. Huff. He did not exaggerate a stereotypical linguistic feature or accent of any other race or ethnicity when referring to an officer of that background. *See* R.388-7 at 1235-39.

[2] At trial, another MEG officer testified that Mr. Douvris separated black agents because "being black, he thought that they would be lazy together and they wouldn't do any work." R.388-2 at 202; *see also* R.388-5 at 877.

Ms. Huff also sought a transfer to another unit and, although the Sheriff's chief of police approved her request, Mr. Douvris apparently blocked it. She was assigned to desk duty, and, in August 1997, her MEG supervisors removed her from that office; she returned to an office of the Sheriff's Department. She learned that the Sheriff had no alternate assignment for her, at which point her employment with the Sheriff ended.

Despite being subject to a distinct command structure within MEG, all Sheriff's Department personnel assigned there apparently continued to be subject to the Sheriff's chain of command and personnel rules; notably, the Sheriff was obligated by contract[3] to determine "work-place rules of conduct" applicable to his employees detailed to MEG and, "if necessary, [to] institute disciplinary actions for [his] employees." Plaintiff's Ex.8 at 2. Mr. Guerra and Mr. Douvris ultimately were disciplined in Sheriff's Department disciplinary proceedings for their use of the racial slurs set forth in Ms. Huff's 1997 report. Mr. Douvris was demoted in rank from commander to sergeant. Mr. Guerra was removed from MEG and placed on patrol for the Sheriff's Department.[4]

---

[3] Although the contract is reproduced only in part in the record on appeal, it appears to have been an intergovernmental agreement between Cook County and the Village of Broadview "as Implementing Agency on behalf of the Metropolitan Group of Cook County." Plaintiff's Ex.8 at 5. The portions of the short agreement included in the record define the responsibilities of the parties in administering the joint program.

[4] Following an investigation and the final report of the Inspector General of the Sheriff's Department, the Sheriff made his

(continued...)

## B. District Court Proceedings

### 1. Pretrial Proceedings

Ms. Huff brought this action in the district court for the Northern District of Illinois. Her complaint set forth a variety of claims, including Title VII disparate treatment and hostile work environment harassment claims against her employer, the Sheriff. 42 U.S.C. § 2000e *et seq*. It also set forth claims under 42 U.S.C. §§ 1981 and 1983 against the Sheriff in his official capacity and against Mr. Guerra and Mr. Douvris in their personal capacities.[5]

The parties engaged in lengthy discovery and, in 2001, all remaining defendants moved for summary judgment. The

---

[4] (...continued)
own decisions regarding these intermediate levels of disciplinary action. Because both officers are merit-protected employees, the Sheriff also forwarded a formal complaint against the officers to the Merit Protection Board, which alone had the right to take more severe action up to and including termination. The Inspector General's report and the Sheriff's decision to take disciplinary action and to seek further disciplinary action demonstrate that the Sheriff's Department retained certain disciplinary authority over officers assigned to MEG such that actions taken by officers in the course of their duties at MEG subjected them to possible disciplinary action by the Sheriff. Indeed, the Sheriff supported the introduction of the reports into evidence as part of his affirmative defense, and the fact of disciplinary action by the Sheriff was among the limited purposes for which the district court deemed the documents admissible. *See* R.388-1 at 61-68.

[5] Certain claims were dismissed on the defendants' motion under Rule 12(b)(6), including the § 1983 claims against the Sheriff and Title VII claims against Mr. Guerra and Mr. Douvris.

district court granted the motions in part and denied them in part. First, the court granted summary judgment to all defendants on the § 1981 claims, based on its conclusion that Ms. Huff, as an at-will employee, could not state a claim under § 1981. The district court also entered judgment for Mr. Guerra on one of the § 1983 claims after concluding that the record did not support the allegation that he had created a hostile work environment. In this ruling, the district court relied on the absence of evidence that the slurs admittedly used by Mr. Guerra ever had been used in a language understandable to Ms. Huff and in her presence.[6] However, the disparate treatment claims, alleging that Mr. Guerra denied her the opportunity to act as group supervisor, denied flex-time, paged her excessively, denied leads on cases, evaluated her unfairly and restricted her break-time reading materials, were allowed to stand.

As to Mr. Douvris, the court granted summary judgment on Ms. Huff's § 1983 disparate treatment claim that alleged that he had assigned Ms. Huff an inferior vehicle as time-barred. It denied summary judgment on her claim that he wrongfully had denied Ms. Huff's requested transfer and that he had ordered her not to socialize with J.D. Lewis, the unit's other African-American staff member. The court also denied summary judgment on Ms. Huff's § 1983 hostile work environment claim against Mr. Douvris. Finally, the district court held that Ms. Huff had created a genuine factual issue as to the Sheriff's

---

[6] Mr. Guerra apparently used racial slurs in Spanish, which Ms. Huff did not understand. *See* R.143 at 14; *see also* R.388-16 at 3271-73.

liability under Title VII for any harassment Ms. Huff had suffered at MEG.

### 2. The Jury Instructions

The parties proceeded to trial on the remaining § 1983 claims against the individual defendants, including the hostile work environment claim against Mr. Douvris and the Title VII hostile work environment claim against the Sheriff. The jury instruction conference was protracted and is difficult to follow on the record before us. The Title VII instruction that is the subject of this appeal was a particular source of conflict between the parties. The parties submitted multiple rounds of proposed Title VII instructions, some of which appear only by transcript reference in the record on appeal. For present purposes, it will suffice to note that Ms. Huff consistently maintained an objection to the Sheriff's proposed Title VII harassment jury instruction. Specifically, Ms. Huff insisted that, before the *Ellerth/Faragher* affirmative defense could be presented to the jury, the jury first had to be asked whether Ms. Huff had proved that the harassment she suffered culminated in a tangible employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). Ms. Huff contended that, if she had proved a tangible employment action, the *Ellerth/Faragher* defense was not available to the Sheriff and that a proper instruction would so indicate.

At the Sheriff's urging, the district court rejected Ms. Huff's repeated contention that the absence of a tangible employment action was a necessary precursor to the jury's consideration of the Sheriff's affirmative defense. *See* R.388-13 at 2324. The court reasoned that hostile work environment claims essentially state that, because of the

harassment, employment conditions became so unbear-
able that they were *equivalent* to a tangible action. The
question of whether the work environment *resulted in* a
tangible action, it determined, unnecessarily muddled
the burdens in a hostile work environment claim with
claims that allege an independently actionable adverse
employment action. Instead, the court concluded that the
availability of an instruction on *Ellerth/Faragher* turned only
on the supervisory level of the harasser, and whether,
because that person was so high within the employer's
structure, the victim effectively would have had no re-
course. The court concluded—indeed, made a determina-
tion of law—that Mr. Douvris and Mr. Guerra were not
such high-level employees, and, therefore, the affirmative
defense was available to the Sheriff.[7] *Id.* at 2324. Ms. Huff's
counsel again objected for the record and, to preserve her
objection, filed a subsequent motion for judgment as a
matter of law that the affirmative defense was unavail-

---

[7] On the objection of Mr. Douvris' counsel, his name, originally
part of plaintiff's proposed hostile work environment Title VII
jury instruction, was stricken by the court. The court ruled that
Ms. Huff could rely on any evidence relating to the severity
and pervasiveness of any harassment while at MEG. Counsel
for the Sheriff objected that this opened new liability for the
Sheriff that was closed by the summary judgment ruling in
favor of Mr. Guerra on the hostile work environment claim. This
argument is not pressed on appeal, and, therefore, we shall
consider claims in the context of the environment of MEG as a
whole, not simply the harassment for which Mr. Douvris is
alleged to be responsible.

able on the facts.[8]

Ultimately, on the Title VII claim, the court instructed the jury on the elements of the claim, largely drawn from the Sheriff's proposed instruction. After stating the elements, the instruction directed the jury:

> If you find [that] the plaintiff proved each of the six elements of her claim, then you should consider whether the defendant Cook County Sheriff's Department has proved the following affirmative defense:
>
> Did the defendant Cook County Sheriff's Department prove by a preponderance of the evidence that it had policies that prohibit discrimination on the basis of race and gender, and procedures that allow employees to report discriminatory treatment, but the plaintiff unreasonably failed to take advantage of those preventative or corrective opportunities?
>
> If you find that the evidence established the affirmative defense put forth by defendant Cook County Sheriff's Department, you should cease deliberation on the issue of hostile work environment and sign a verdict form in favor of defendant Cook County Sheriff's Department on that claim.
>
> If you find that defendant has not proved its affirmative defense, you should sign a verdict form in favor of plaintiff Huff on her hostile work environment claim.

---

[8] That motion also raised a series of objections that Ms. Huff repeats in this appeal, but that were not raised previously in the jury instruction proceedings before the district court.

R.349 at 31-32; *see also* R.390-1 at 4414-15.[9] There was no mention of tangible employment actions in the Title VII instruction. The jury returned its verdict for all defendants on all claims.

### 3. Post-trial Proceedings

Ms. Huff filed a motion for a new trial on the Title VII harassment claim. She argued that she had been prejudiced by erroneous jury instructions. In that motion, Ms. Huff restated and expanded the objections that she had made in her March 5th motion for judgment as a matter of law. She included her objection that the instruction given failed to recognize that, when hostile work environment harassment leads to a tangible employment action, the *Ellerth/Faragher* defense becomes unavailable. *See* R.353, 359 at 9-11.

On January 26, 2005, the district court denied that motion. The court concluded that Ms. Huff had

> failed to prove that Douvris and Guerra were supervisors of Huff within the Sheriff's Department. All the evidence indicated that they were supervisors of Huff within MEG, a separate governmental entity, although they were employees of the Sheriff's Department and detailed by the Sheriff's Department to MEG. Because there was no evidence that the alleged

---

[9] We set forth the affirmative defense instruction in its entirety to assist the reader in understanding the context in which the issue before us arose in the district court. Our setting out the instruction does not indicate our approval of its content as a correct statement of the law. *See infra* at 11-12 & n.13.

harassers were supervisory employees within the Sheriff's Department, the Sheriff was entitled to have the jury instructed on its affirmative *Ellerth* defense.

R.381 at 2. Ms. Huff timely appealed the judgment entered against her on this claim and the denial of her motion for a new trial to this court.

## II

## DISCUSSION

On appeal, Ms. Huff contends that the jury instruction is fraught with legal error and that the errors were sufficiently prejudicial to warrant reversal of the judgment against her on the Title VII harassment claim. She raises each of the claims of error presented in her new trial motion, namely: (1) that the jury erroneously was instructed according to the negligence-based liability standard applicable to co-worker harassment claims; (2) that the jury could have applied the affirmative defense without first finding that no tangible employment action occurred; and (3) that the phrasing of the affirmative defense instruction itself erroneously lowered the Sheriff's burden below the standards established by the Supreme Court. Ms. Huff now adds that the instruction also stated incorrectly that she must prove that the harassment she suffered was *both* severe *and* pervasive. The multiple rounds of proposed instructions and the shifting positions of the parties create difficult questions of waiver and forfeiture on the majority of Ms. Huff's challenges to the Title VII instruction. As the record makes clear and the Sheriff acknowledges, however, Ms. Huff adequately preserved her objection to the inclusion of the affirmative defense without an accompanying inquiry into whether the

harassment resulted in a tangible employment action. Because we agree with Ms. Huff that this portion of the instruction did not apprise the jury of the applicable law and that the error was prejudicial, we need not untangle the confusion that attends the district court's rulings on her other contentions.

## A.  The Affirmative Defense Instruction

We review jury instructions de novo to determine whether, taken as a whole, they correctly and completely informed the jury of the applicable law. *Schmitz v. Canadian Pac. Ry. Co.*, 454 F.3d 678, 681-82 (7th Cir. 2006); *see also Boyd v. Illinois State Police*, 384 F.3d 888, 894 (7th Cir. 2004). We defer to the district court's phrasing of an instruction that accurately states the law, *Schmitz*, 454 F.3d at 682; however, we shall reverse when the instructions "misstate the law or fail to convey the relevant legal principles in full" and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant. *Byrd v. Illinois Dep't of Pub. Health*, 423 F.3d 696, 705 (7th Cir. 2005). We review a district court's decision on a motion for a new trial for an abuse of discretion. *Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 729 (7th Cir. 2002). However, if the district court committed legal error in instructing the jury, the decision to deny the new trial was itself an abuse of discretion. *See Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007), *cert. denied*, 75 U.S.L.W. 3637 (U.S. June 18, 2007) (No. 06-1525), (noting that a court categorically abuses its discretion when a decision rests on legal error).

In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998),

decided the same day, the Supreme Court considered the contours of employer liability under Title VII for workplace harassment by supervisors. In *Ellerth*, the Court began with the statutory text, which makes it unlawful for *an employer* to discriminate based on sex, race or other protected characteristics and defines an employer to include its "agent[s]." 42 U.S.C. §§ 2000e-2(a)(1), 2000e(b). Noting the general principle that agency liability will attach when an agent commits a tort within the scope of his employment, the Court concluded that harassment is not generally such an act. *Burlington Indus.*, 524 U.S. at 756-57. The Court further noted that an employer can also be liable, consistent with principles of agency law, for acts outside the scope of employment when committed by a servant who was "aided in accomplishing the tort by the existence of the agency relation." *Id.* at 758 (quoting Restatement of Agency § 219(2)(d)). To be aided in the agency relation, the Court continued, meant more than simply that the existence of an employment relationship provided the proximity and regular contact that facilitated harassment. That rule would be too broad, the Court concluded, because it would obliterate the distinction between employer liability for coworker harassment and for supervisor harassment recognized in the regulations and the case law. *Id.* at 760.

Although the Court declined to define with precision when this standard—that a supervisor was aided in accomplishing the tort by the agency relation—would be satisfied, the Court held that, at minimum, it was satisfied in that class of cases in which a supervisor "takes a tangible employment action against the subordinate." *Id.* Such a rule was appropriate because "[w]hen a supervisor makes a tangible employment decision, there is assurance

the injury could not have been inflicted absent the agency relation." *Id.* at 761-62. A supervisor whose harassment of a subordinate culminates in a tangible employment action has acted as an agent of the employer and thus has created liability for the employer. *Id.* at 762.

The Supreme Court then announced the following rule:

> An employer is subject to *vicarious liability* to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages*, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . *No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action*, such as discharge, demotion, or undesirable reassignment.

*Id.* at 765 (emphasis added); *Faragher*, 524 U.S. at 807-08 (emphasis added). In *Faragher*, the Court noted that this approach appropriately held employers liable for certain specific misuses of supervisory authority; at the same time, however, it encourages all parties involved to take appropriate steps to avoid harm, consistent with the purposes of the statute. 524 U.S. at 805-06. In both *Ellerth* and *Faragher*, however, the Supreme Court *explicitly*

conditioned the availability of the affirmative defense on the absence of a tangible employment action.

In recent years, the Supreme Court has confirmed that the presence or absence of a tangible employment action is the critical issue in determining whether, in a supervisory harassment claim, an employer may raise the *Ellerth/ Faragher* affirmative defense. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 143, 148-50 (2004) (holding that constructive discharge was not a "tangible employment action" within the meaning of *Ellerth* and *Faragher* unless it was precipitated by some official act of the enterprise for which it was a certainty that the harassing supervisor was "aided by the agency relation"). Our own cases consistently have applied this standard. *See, e.g.*, *Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007) (noting that liability is "strict" when the supervisor harassment is accompanied by an official action such "as discharge, demotion, or undesirable reassignment"); *Robinson v. Sappington*, 351 F.3d 317, 337 (7th Cir. 2003) (holding that, when a constructive discharge was precipitated by the official action of a transfer to what the employee claimed would be an unbearable situation, no affirmative defense was available).

In Ms. Huff's case, at the instruction conference, the district court ruled that the absence of a tangible employment action is not a necessary precondition to the availability of an affirmative defense. That view cannot be reconciled, as a matter of law, with the standard set forth in *Ellerth* and *Faragher* and elaborated upon in *Suders*. On the contrary, if Ms. Huff can demonstrate that a supervisor's harassment culminated in a tangible employment action, the Sheriff may not raise an affirmative defense; his

liability will be strict.[10]

We note that the record contains evidence that would support submitting potential tangible employment actions to the jury, including denial of case leads critical to career advancement and denial of a transfer.[11] We also note that, at trial, the Sheriff repeatedly contended that Mr. Guerra and Mr. Douvris did not supervise Ms. Huff for the Sheriff's Department, and that, therefore, Ms. Huff could

---

[10] At oral argument, counsel for the Sheriff told this court that the Sheriff did not concede error in the instruction. However, we do not discern from his brief to this court any concrete suggestion that the *Ellerth/Faragher* defense correctly was presented to the jury or that, for any other reason, Ms. Huff was not entitled to a jury instruction that couched her claims in the context of the standards for supervisor harassment culminating in a tangible employment action.

[11] *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (collecting cases in which the standard for a tangible employment action is satisfied by "a nominally lateral transfer with no change in financial terms," which simultaneously "significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that . . . his career is likely to be stunted," or by other official action that "change[s the employee's job] in a way that injures his career," even if unaccompanied by a transfer); *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000) (holding that removing resources necessary for the plaintiff-employee to do her job constituted a tangible employment action).

Under this precedent, either of these actions could satisfy the tangible employment action. Both are decisions within the scope of the individual defendants' supervisory authority.

only establish the Sheriff's liability by satisfying the more rigorous burdens applicable in claims of co-worker harassment. This argument is not one the Sheriff has pressed to this court on appeal. In any event, we note that the Sheriff's claim in the district court that the individual defendants were not supervisors for the Sheriff *as a matter of law* lacks support in the record before us.[12] If the individual defendants indeed were authorized to take tangible employment actions against Ms. Huff, *affecting her employment relationship with the Sheriff*, this authority in and of itself is sufficient evidence from which a jury could conclude that Mr. Guerra and Mr. Douvris were supervising Ms. Huff on behalf of the Sheriff's Department. As the Supreme Court has noted, tangible employment actions fall within the special province of the supervisor. *Burlington Indus.*, 524 U.S. at 762; *see also Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998) ("[T]he essence of supervisory status is the authority to affect the terms and conditions of the victim's employment."). Ms. Huff, therefore, was entitled to an instruction that properly placed the elements of a supervisory harassment claim before the jury.

---

[12] In ruling on the post-trial motion, the district court concluded that none of the evidence demonstrated that the individual defendants were supervisors for the Sheriff. The district court went on to conclude that *because* the defendants were not supervisors, the affirmative defense *was* available. This is incorrect. The affirmative defense comes into play, as *Ellerth* makes clear, when the employer would otherwise be held *vicariously* liable for supervisor harassment. *See generally Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758-65 (1998).

**B. Prejudice**

   With regard to the affirmative defense in the Title VII instruction, the Sheriff submits that any error in the jury instruction was harmless. The harmlessness is evident, the Sheriff continues, because the verdicts rendered in favor of the individual defendants on the § 1983 hostile work environment claims conclusively demonstrate that the jury decided that no harassment in fact had occurred. The jury similarly must have concluded that a failure of proof of harassment was dispositive on Ms. Huff's Title VII claim as well, and, therefore could not have reached the issue of the affirmative defense, whether or not erroneously presented. We now examine the Sheriff's claim that the § 1983 verdict tells us all we need to know about the jury's consideration of the Title VII claim.

   We have stated, as the Sheriff concedes, that because the Constitution prohibits *intentional* discrimination by state actors, § 1983 relief is available to a plaintiff claiming a hostile work environment only when she can demonstrate that the defendant acted with discriminatory intent. *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990); *see also Valentine v. City of Chicago*, 452 F.3d 670, 683 (7th Cir. 2006) (noting the requirement of intentional discrimination). The same is not true of a Title VII plaintiff claiming hostile work environment harassment. *See King v. Bd. of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537-38 (7th Cir. 1990) ("One difference between sexual harassment under equal protection and under Title VII, however, is that the defendant must intend to harass under equal protection . . . but not under Title VII, where the inquiry is solely from the plaintiff's perspective." (internal citation omitted)); *Bohen v. City of East Chicago, Indiana*, 799 F.2d 1180, 1187 (7th Cir. 1986) ("[T]he ultimate inquiry [in a

§ 1983 hostile work environment equal protection claim] is whether the sexual harassment constitutes intentional discrimination. This focus differs from the inquiry under Title VII as to whether the sexual harassment altered the conditions of the victim's employment."); *see generally Valentine*, 452 F.3d 670, 677-85 (examining Title VII and § 1983 claims separately and considering discriminatory intent only in the context of the § 1983 claim).

Of course, "[s]exual harassment under Title VII presupposes intentional conduct." *Burlington Indus.*, 524 U.S. at 756. But the supposition that harassing conduct is *intentional* in the tort liability sense, as opposed to negligent, does not mean that a hostile work environment is actionable under Title VII only when the perpetrator acts with a purpose to discriminate. Indeed, this court has acknowledged that sexual harassment may be actionable under Title VII by a plaintiff who was not the direct target of workplace conduct if the plaintiff is within the protected class the conduct targets generally. *See, e.g.*, *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) (noting that there need not be "an intention of causing distress or offense" and that women in a workplace may state a claim for harassment even though "[t]he darts were aimed elsewhere, and hit the women by accident"). This distinction could be of paramount importance in Ms. Huff's own case, where certain of her allegations of harassment could be read as *lacking* discriminatory intent and evincing a kind of extreme workplace "insensitivity." *Id.* For example, Ms. Huff claims that explicit racially and sexually charged language was directed to her, or was used in her presence but directed at others. The jury might have interpreted

this conduct as sufficiently severe and pervasive[13] to have created an actionable hostile work environment. However, the jury may have concluded that the basis for the behavior was stupidity and uncouthness on the part of the individual defendants—sufficient for Title VII liability, but not evincing the discriminatory intent required for liability under § 1983.

The Sheriff accepts that this difference in the elements of the two types of claims would prevent us, in the ordinary case, from viewing a general verdict for a defendant on a § 1983 sexual harassment claim as dispositive on a Title VII claim. Nonetheless, the Sheriff claims that, in this case, the § 1983 hostile work environment jury instruction actually given contained a fortuitous error: It omitted the element of intent. Whatever value the Sheriff's contention might have in a case where the intent element truly was omitted from the instruction, we conclude that it is unsupported by the record.

In examining the impact of a jury instruction, it is firmly established that we must evaluate the instructions given to the jury in their entirety. *Schmitz*, 454 F.3d at 681-82. The district court began the instructions by explaining that Ms. Huff had alleged *both* disparate treatment and

---

[13] The district court instructed the jury that conduct must be severe *and* pervasive to give rise to an actionable hostile work environment. Although we do not reach this error in our disposition of this case to avoid issues of waiver, we note for the sake of clarity that the use of the conjunctive misstates the legal standard for harassment. *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) ("We reiterate now that conduct that is *either* pervasive *or* severe may give rise to a hostile work environment." (emphasis in original)).

hostile work environment claims under § 1983. The court then read aloud the first substantive legal instruction, which stated:

> *To establish a claim under Section 1983 against defen-dants Guerra and Douvris*, plaintiffs must establish by a preponderance of the evidence each of the following six elements:
>
> First. That the conduct complained of was committed by a person acting under color of state law.
>
> Second. That plaintiffs are members of a protected class.
>
> Third. That defendants treated plaintiffs differently from similarly-situated agents who were not members of a protected class.
>
> Fourth. That plaintiff sustained an "adverse employ-ment action" as a result of being treated differently.
>
> Fifth. *That in treating plaintiffs differently, defendants acted with discriminatory intent.*
>
> Sixth. That defendants' acts were the proximate cause of the adverse employment action *or subjected plaintiffs to a hostile work environment* and consequent damages sustained by the plaintiffs.
>
> *I'll now examine each of these elements in more detail for you.*

R.390-1 at 4401-02 (emphasis added). The district court then proceeded to discuss the relevant legal definitions of *each* of the above terms. *See id.* at 4402-03 ("When I say members of a protected class, I mean . . . . When I say similarly-situated agents, I mean . . . ."). Within this discussion, the court defined discriminatory intent: "When I say acted

with discriminatory intent, I mean that plaintiffs must show that defendant Guerra and/or defendant Douvris intentionally and purposefully engaged in the misconduct alleged by plaintiffs because of plaintiffs' membership in a protected class." *Id.* at 4403. The court then defined the concept of proximate cause, after which it proceeded to state the following instruction:

> To prove her hostile environment claim under Section 1983, plaintiff Huff must prove each of the following elements:
>
> 1. That she was continuously and repeatedly subjected to racially and/or sexually offensive acts or statements or for different treatment based on race and/or sex. For purposes of a Section 1983 hostile work environment claim, conduct that only amounts to ordinary socializing in the workplace, such as occasional horseplay, sexual flirtation, sporadic or occasional use of abusive language, does not constitute a hostile work environment.
>
> 2. That such treatment or acts or statements were unwelcome and not invited or solicited by the employee['s] own acts or statements.
>
> 3. That such treatment or such acts or statements resulted in a work environment that was permeated with discriminatory intimidation, ridicule, or insult of sufficient severity or pervasiveness that it materially altered the conditions of plaintiff['s] employment.
>
> 4. That a reasonable person would have found the workplace to be hostile. For purposes of a Section 1983 hostile work environment claim,

in determining whether a hostile work environment existed, you must consider the evidence from the perspective of a reasonable person. This is an objective standard and requires you to look at the evidence from the perspective of a reasonable person's reaction to a similar environment under similar circumstances.

5.  That plaintiff personally experienced the workplace as hostile.

And 6. That some act contributing to the hostile environment occurred after June 26, 1995.

R.390-1 at 4403-05. The Sheriff invites the attention of this court *only* to this final portion of the instruction. He is correct that this particular portion of the instruction says nothing about intent.

Reading the § 1983 instructions as a whole, however, we think a reasonable jury would have understood that this section merely *defined* the element of hostile work environment as one piece of plaintiff's burden to establish liability under § 1983. The court's full § 1983 instruction clearly did require the jury to find that the defendants acted with discriminatory intent. Therefore, absent a special verdict[14] on either the Title VII or the § 1983 claims, we do not know that the jury's verdict on each claim rested on a single conclusion that Ms. Huff failed to demonstrate a hostile

---

[14] In closing, we note that the Sheriff would have been in a better position to argue an absence of prejudice had the parties insisted upon special interrogatories. Special interrogatories are particularly advisable in cases such as this, where multiple complicated and interrelated claims are submitted to a jury after a five week trial.

work environment. The jury may have concluded, operating within the instructions given, that the working environment to which Ms. Huff was subjected *was* actionably hostile, but that the individual defendants were not liable under § 1983 because they had not acted with discriminatory intent. Accordingly, we cannot read the jury's verdict on the § 1983 claim as embodying a conclusion that Ms. Huff was not harassed. Therefore, in determining the Sheriff's Title VII liability, the jury may have reached and relied on the Sheriff's affirmative defense. That defense, as we have noted, was not available to the Sheriff if Ms. Huff proved her claims that her harassment culminated in a tangible employment action.

The error in submitting the issue to the jury without the accompanying predicate inquiry of whether there was a tangible employment action, therefore, did prejudice Ms. Huff's claims.

**Conclusion**

Because we have concluded that the district court committed reversible error in instructing the jury on the affirmative defense portion of Ms. Huff's Title VII claim, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion. Ms. Huff may recover her costs in this court.

REVERSED and REMANDED

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—7-16-07